# In the United States District Court for the Southern District of Georgia Brunswick Division

| | |
|---|---|
| DONTE S. PERRY,<br><br>Plaintiff,<br><br>v.<br><br>ADRIANA BAKER-GAMBOA, JONI A. MILLER, and KIMBERLY A. ZYDONYK,<br><br>Defendants. | 2:25-CV-76 |

## ORDER

This action is before the Court on Defendants' motion to dismiss the second amended complaint, dkt. no. 46. The parties have fully briefed the motion and participated in oral argument before the Court, dkt. nos. 46, 48, 52, 54, 56, 59, and the motion is ripe for review. For the reasons set forth below, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**.

## BACKGROUND[1]

A'Niyah Perry passed away on May 1, 2023, at the age of six. Dkt. No. 44 ¶¶ 8, 61. The present civil action seeks compensation

---

[1] At this procedural posture, the Court must "accept all factual allegations in a complaint as true and take them in the light most favorable to [the] plaintiff[.]" Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1246 (11th Cir. 2016) (citing Erickson v. Pardus, 551 U.S. 89, 94 (2007)). "[L]egal conclusions without adequate factual support are entitled to no assumption of truth." Id. (quoting Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011)).

from various employees of the Georgia Division of Family and Children Services ("DFCS") who, according to the second amended complaint, failed to act in accordance with the duties of their employment, leading to A'Niyah's death. See generally id.

According to the second amended complaint, A'Niyah was a victim of continued "physical abuse and neglect" perpetrated by her mother, Shelly Perry, and her mother's boyfriend, Brandon Robinson, eventually leading to A'Niyah's death.[2] Id. ¶¶ 8-9. Plaintiff contends that criminal prosecutions arising from A'Niyah's death against Shelly Perry and Brandon Robinson are pending in the Superior Court of Liberty County, Georgia. Id. ¶ 11.

The events involving Plaintiff described in the second amended complaint begin around April 2023. Id. ¶¶ 23-69. Plaintiff Donte Perry, A'Niyah's biological father, received a telephone call from Brandon Robinson on April 18, 2023, during which Robinson expressed concern regarding A'Niyah's physical condition. Id. ¶ 28. More specifically, Robinson allegedly told Plaintiff, "I don't want you to freak out, but your daughter [A'Niyah] looks like a skeleton." Id. ¶ 29. Robinson stated that he would send Plaintiff a photograph of A'Niyah but failed to do so. Id. ¶ 30. Following this alarming phone call, Plaintiff went to Shelly Perry and Robinson's home, but no one answered the door. Id. ¶ 31.

[2] Neither Shelly Perry nor Brandon Robinson are parties to this civil action.

The next day, on April 19, 2023, Plaintiff contacted DFCS to relay concerns he had about A'Niyah's condition as a result of his call with Robinson. Id. ¶¶ 25-28. At that time, Defendant Baker-Gamboa worked for the Liberty County, Georgia, DFCS office and was responsible for answering incoming phone calls from the public, handling intake for child abuse and neglect reports, and looking up past and current cases using "SHINES"-the DFCS internal network. Id. ¶¶ 23-24. Plaintiff alleges that, when he called the publicly available phone number for Liberty County DFCS, Baker-Gamboa answered, and Plaintiff told Baker-Gamboa that "his daughter, A'Niyah, was being neglected and starved, and was held captive on the road with her mother Shelly Perry and Brandon Robinson." Id. ¶¶ 25-27.

Plaintiff also allegedly told Baker-Gamboa about the phone call he had with Robinson the day prior and requested that Baker-Gamboa open an investigation to locate A'Niyah and help her escape the purported abuse and neglect she had been experiencing. Id. ¶¶ 28, 32. Baker-Gamboa, however, stated that there was "nothing" DFCS could do and instructed Plaintiff to call the Child Protective Services ("CPS") hotline. Id. ¶ 33. Baker-Gamboa gave Plaintiff a CPS phone number to call, and Plaintiff twice attempted to call that number on April 19, 2023, but the line continued to ring, and no one at CPS answered either call. Id. ¶¶ 33-34.

According to the second amended complaint, Baker-Gamboa was a mandatory reporter who was required to report A'Niyah's abuse, but she failed to make such a report after her telephone conversation with Plaintiff. Id. ¶¶ 42–50. Plaintiff contends that Baker-Gamboa was trained on how to process intake reports about suspected abuse or neglect under DFCS Child Welfare Policy 3.1, which lists the following responsibilities:

> 1. Receive reports 24 hours a day, seven days a week, of known or suspected instances of child abuse, including reports of physical or mental injury, sexual abuse or exploitation or negligent treatment or maltreatment of a child under circumstances that indicate that the child's health or welfare is threatened.
>
> 2. Be available and accessible to the community continuously 24 hours a day, seven days a week via CPS Intake Communications Center (CICC) at 1-855-GACHILD (1-855-422-4453).

Id. ¶ 48. Despite her alleged knowledge of these policies, her status as a mandatory reporter, and her purported access to an in-house CPS investigator working in the Liberty County DFCS office, Baker-Gamboa allegedly did not make an oral or written report of A'Niyah's abuse, nor did she process intake of Plaintiff's report of abuse and neglect after the April 19, 2023 phone call. Id. ¶¶ 49–56.

Plaintiff contends that Baker-Gamboa's failure to properly report and document the abuse and neglect of A'Niyah led to A'Niyah's death. Id. According to the second amended complaint, proper reporting would have notified CPS and local law enforcement

of the abuse, and investigators would have been able to locate Robinson—a truck driver—via a tracking device on his truck. Id. ¶¶ 56–58. Plaintiff believes that this would have led investigators to locate A'Niyah and ensure she received proper medical care before it was too late. Id. ¶¶ 57-60.

Plaintiff also takes issue with Baker-Gamboa's alleged failure to properly process intake of an abuse report because proper intake would have necessarily included a review of the case history. Id. ¶¶ 65–67. For example, the case history noted by Plaintiff in the operative complaint would have allegedly revealed that A'Niyah had Cerebral Palsy, and, as a result, was designated as "medically fragile." Id. ¶ 69. A'Niyah was also an individual with special needs and was only partially vocal. Id. ¶ 77. On multiple occasions purportedly summarized in the case history, Shelly Perry failed to take A'Niyah to her medical appointments and did not stay up-to-date on A'Niyah's prescription refills, leading to a pattern of concern by DFCS case workers. Id. ¶ 69. Additionally, Plaintiff alleges the case history shows that both he and A'Niyah's doctors lodged neglect reports against Shelly Perry. Id. ¶ 68.

Plaintiff also claims that, with proper review of case history, Baker-Gamboa would have learned of the most recent case prior to A'Niyah's death, which involved an "unexplained broken leg and neglect" of which DFCS received notice on July 12, 2020.

Id. ¶ 70. That incident triggered an eighteen-month-long DFCS case, which was open until December 2021. Id. ¶¶ 71, 87. DFCS also filed for a protective order, which was granted in October 2020, and, on December 31, 2020, the juvenile court deemed A'Niyah a dependent pursuant to Georgia law. Id. Plaintiff contends that the juvenile court's December 31, 2020 order left A'Niyah in her mother's custody, subject to a variety of conditions. Id. ¶¶ 71–72.

Alongside these proceedings in juvenile court and the DFCS case, the Georgia Bureau of Investigation ("GBI") also opened a felony criminal investigation surrounding the cause of A'Niyah's injuries. Id. ¶ 80. The second amended complaint outlines a series of alleged communications between GBI investigators and the DFCS case manager, during which the case manager was apprised of the GBI investigation and learned of the GBI's concerns that Shelly Perry was "deceitful" and "not a credible witness." Id. ¶¶ 80–81. In sum, the second amended complaint describes reports by the GBI to DFCS concerning: potential domestic abuse; A'Niyah's rapid weight loss which led to her hospitalization in October 2020 because she had not received the protein supplements she needed; a hospital social worker's concerns about Shelly Perry's ability to care for A'Niyah's medical needs; and concerns that Shelly Perry would not partake in required counseling, parenting classes, and psychiatric evaluation. Id. ¶¶ 80–83.

Despite all of this, and despite their access to the internal DFCS SHINES documentation system and their alleged knowledge of the pending GBI investigation, DFCS case manager Joni A. Miller and DFCS supervisor Kimberly A. Zydonyk recommended that DFCS close the case in Fall 2021. Id. ¶ 84. Plaintiff alleges that neither Defendant Miller nor Defendant Zydonyk told the juvenile court judge that Shelly Perry had an active warrant for her arrest in July 2020 related to probation violations, nor did Miller or Zydonyk contact the GBI for additional information on its ongoing investigation before recommending case closure. Id. ¶¶ 90–93.

On May 1, 2023, just two weeks after Plaintiff spoke to Baker-Gamboa on the phone, Hinesville Police responded to a 911 call about an unresponsive child at what Plaintiff claims to be Shelly Perry and Robinson's apartment. Id. ¶¶ 8, 35. Plaintiff contends that officers discovered the "emaciated body" of six-year-old A'Niyah at the scene, prompting officers to contact DFCS for further investigation. Id. ¶¶ 36–37. A DFCS case worker who subsequently arrived at the residence observed that A'Niyah "did not appear alive," she had protruding ribs and pelvic bones and weighed only twenty-eight pounds, and she "appeared malnourished with her face sunken in." Id. ¶ 37. The case worker also noted that the home had little to no food, animal feces in the carpet and around the home, and bugs coming out of the microwave. Id. The autopsy report prepared by the GBI Medical Examiner determined

that A'Niyah suffered from malnutrition and dehydration at the time of her death, and her Body Mass Index ("BMI") had dropped to 11.1, below the first percentile for children her age. Id. ¶¶ 39–40. The report also noted signs of malnutrition and dehydration, such as muscle wasting, prominent ribs and vertebrae, eyes sunken in orbits, and scapular and scaphoid abdomen. Id. ¶ 41.

Plaintiff, as the temporary administrator of A'Niyah's estate, filed suit in the Superior Court of Long County, Georgia, on April 18, 2025, seeking to hold various DFCS employees liable for alleged actions or omissions leading up to A'Niyah's death. Dkt. No. 1-1. Defendants removed the case to this Court and then filed a motion for judgment on the pleadings. Dkt. Nos. 1, 11. Before the Court ruled on Defendants' motion for judgment on the pleadings, dkt. no. 11, Plaintiff filed an amended complaint, dkt. no. 21, and the Court denied Defendants' motion as moot, dkt. no. 25. Defendants then moved to dismiss the amended complaint. Dkt. No. 29. Following briefing and oral argument, the Court orally denied Defendants' motion to dismiss, giving Plaintiff ten days to file a second amended complaint addressing "shotgun pleading" and substantive deficiencies identified at the motion hearing. Dkt. No. 43. Plaintiff timely filed a second amended complaint on January 22, 2026. Dkt. No. 44.

In the second amended complaint, Plaintiff names as Defendants DFCS employee Baker-Gamboa, along with DFCS case

manager Miller and DFCS supervisor Zydonyk. Dkt. No. 44 ¶¶ 2–4. Plaintiff asserts three counts against Defendants in their individual capacities only: one claim for violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983 (Count I); one claim for wrongful death, citing 42 U.S.C. §§ 1983 and 1988 (Count II); and one count seeking attorneys' fees and costs under 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11. See generally id. Defendants now move to dismiss the second amended complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 46. Plaintiff responded, dkt. no. 48, Defendants replied, dkt. no. 52, Plaintiff filed a sur reply in opposition, dkt. no. 54, Defendants filed an additional sur reply, dkt. no. 56, and the Court held oral argument on the motion to dismiss on July 7, 2026, dkt. no. 59.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." When analyzing whether this standard is satisfied, a court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347–48 (11th Cir. 2016) (citing Ironworkers Loc. Union 68 v. AstraZeneca Pharms., LP, 634 F.3d 1352, 1359 (11th Cir. 2011)). Legal conclusions, however, are not entitled to the same presumption of truth. Ashcroft v. Iqbal, 556 U.S. 662, 678-79

(2009). In other words, the Court should not accept allegations as true if they merely recite the elements of a claim and declare that they are met. Id. Instead, a complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282–83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

The core inquiry at the motion to dismiss stage is whether the complaint contains sufficient factual matter, if accepted as true, to "state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This "plausibility standard" means that the complaint must contain sufficient factual information to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). While this is not a probability requirement, a complaint must give rise to "'more than a sheer possibility' that the plaintiff's allegations are true." Gissendaner v. Comm'r, Ga. Dep't of Corr., 803 F.3d 565, 568 (11th Cir. 2015) (quoting Iqbal, 556 U.S. at 678).

**DISCUSSION**

The motion to dismiss before the Court sets forth three primary arguments for dismissal. See generally Dkt. No. 46-1.

First, Defendants contend that Plaintiff's wrongful death claim (Count II) against Defendants Miller and Zydonyk is barred by the applicable statute of limitations. Id. at 6–7. Second, Defendants argue that Plaintiff fails to plausibly allege the substantive due process violation challenged in Count I. Id. at 7–16. Finally, Defendants argue that both of Plaintiff's Fourteenth Amendment claims (Counts I and II) should be dismissed on qualified immunity grounds. Id. at 16–17.

**I. Statute of Limitations**

Regarding the statute of limitations, Defendants contend that Plaintiff failed to bring his wrongful death claim against Defendants Miller and Zydonyk within the applicable statute of limitations period, warranting dismissal of Count II with respect to those two Defendants. See id. at 6–7. In Count II, Plaintiff seeks recovery for wrongful death in violation of A'Niyah's constitutional rights pursuant to 42 U.S.C. §§ 1983 and 1988.[3] Dkt.

[3] Though recognizing that the right to wrongful death recovery under Section 1983 "has generated considerable debate" across the circuit courts, the Eleventh Circuit nonetheless allows for such claims based on the binding "old Fifth Circuit" decision in Brazier v. Cherry, 293 F.2d 401, 409 (5th Cir. 1961). Carringer v. Rodgers, 331 F.3d 844, 850 n.9 (11th Cir. 2003). Brazier held that Georgia's wrongful death statute is incorporated into Section 1983 via 42 U.S.C. § 1988, 293 F.2d at 409, and, as a result, the Eleventh Circuit in Carringer recognized that a parent of a child has standing to assert a Section 1983 claim for the wrongful death of the child to recover for a violation of the child's constitutional rights, 331 F.3d at 850 n.9. But see Robertson v. Hecksel, 420 F.3d 1254, 1261 (11th Cir. 2005) (determining that Brazier and Carringer are not controlling when a parent brings a Section 1983

No. 44 ¶¶ 133–39. There is no specific limitations period for actions brought under Section 1983. Allen v. King, 279 F. App'x 847, 848 (11th Cir. 2008) (citing Owens v. Okure, 488 U.S. 235, 239 (1989)). Instead, under 42 U.S.C. § 1988, "courts determine the appropriate statute of limitations for § 1983 actions by looking at the analogous state statute of limitations in cases of tort actions for the recovery of damages for personal injury." Johnson v. Culpepper, No. 19-11565, 2021 WL 3778363, at *3 (11th Cir. Aug. 26, 2021) (citing Owens, 488 U.S. at 249–50). The parties agree that the applicable limitations period is two years. See Dkt. No. 46-1 at 6; Dkt. No. 48 at 4–5; O.C.G.A. § 9-3-33 (two-year limitations period for injuries to the person); see also Toomer v. Metro Ambul. Servs., Inc., 875 S.E.2d 479, 484 (Ga. Ct. App. 2022) (clarifying that actions seeking recovery for wrongful death under Georgia law are subject to the general two-year personal injury statute of limitations).

When the limitations clock starts ticking—that is, when the action accrues—is the primary issue disputed by the parties. Dkt. No. 46-1, 48, 52, 54, 56. On one hand, Defendants contend that Plaintiff's wrongful death claim against Miller and Zydonyk accrued on or before December 10, 2021, the date the dependency

---

wrongful death suit to recover for a violation of the constitutional rights of the *parent*, rather than the deceased *child*).

case was closed in juvenile court and the last day Miller and Zydonyk interacted with Plaintiff's case. Dkt. No. 46-1 at 7 (citing Dkt. No. 44 ¶ 87). Defendants claim that this is the proper accrual date because this was when "wrongful act[s] or omissions" (Miller and Zydonyk recommending case closure) "result[ed] in damages" (the case closure which Plaintiff claims led to A'Niyah's death). Id. (quoting Wallace v. Kato, 549 U.S. 384, 387 (2007)).

Defendants further argue that December 10, 2021 is the proper accrual date even if A'Niyah did not pass away until May 2023 because a cause of action can accrue even when the "full extent of the injury is not then known or predictable." Id. (citing Wallace, 549 U.S. at 391). This accrual date would mean that the wrongful death claims against Miller and Zydonyk are barred by the statute of limitations period because this action was not initiated in the Superior Court of Long County, Georgia, until April 18, 2025—more than two years later. Dkt. No. 1-1. On the other hand, Plaintiff contends that the wrongful death cause of action accrued on A'Niyah's date of death. Dkt. No. 48 at 4–5. Put plainly, Plaintiff states that "[a] plaintiff cannot bring a wrongful death suit before anyone has died." Dkt. No. 54 at 2.

Plaintiff has the winning argument. Indeed, it is easy to imagine Defendants opposing a wrongful death claim filed on behalf of a living person precisely because a death claim has not accrued while the person is living. The time at which the two-year

limitations period begins to run is a matter of federal law. Culpepper, 2021 WL 3778363, at *3 (citing Wallace, 549 U.S. at 388). It is true that, as noted by Defendants, dkt. no. 46-1 at 6–7, the Eleventh Circuit has held that certain Section 1983 claims are governed by a discovery rule, such that the statute of limitations begins to run on a claim when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." Foudy v. Indian River Cnty. Sheriff's Off., 845 F.3d 1117, 1122–23 (11th Cir. 2017) (citing Rozar v. Mullis, 85 F.3d 556, 561–62 (11th Cir. 1996)). "On the other hand, according to the Supreme Court, the ordinary rule is that a § 1983 claim accrues 'when the plaintiff has a complete and present cause of action.'" Id. (quoting Wallace, 549 U.S. at 388); see also Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (holding that a § 1983 action for unlawful termination of public employment accrues when the unlawful act, namely the decision to terminate, took place). Other Eleventh Circuit caselaw indicates that a Section 1983 claim "accrues only once the plaintiff knows or should know 'the injury that forms the basis of [his] complaint,' as well as who caused that injury." Chapman v. Dunn, 129 F.4th 1307, 1316 (11th Cir. 2025).

The Court holds that Plaintiff's Section 1983 wrongful death claim is not barred by the statute of limitations because the claim did not accrue until A'Niyah's death. The "injury that forms the

basis" of Plaintiff's wrongful death claim is A'Niyah's death, which did not occur until May 2023, even if the alleged wrongful closure of the dependency case played a part in the causal chain leading to her death. Dkt. No. 44 ¶ 133-39. Accordingly, to the extent the motion to dismiss before the Court seeks dismissal on statute of limitations grounds, the motion is **DENIED**, as Plaintiff initiated this action on April 18, 2025, less than two years after the point of accrual in May 2023. Dkt. No. 1; Toomer, 875 S.E.2d at 484.

## II. Failure to Plausibly Allege Substantive Due Process Violation

Defendants next argue that Plaintiff fails to plausibly allege Count I, a Section 1983 claim seeking recovery for an alleged deprivation of A'Niyah's rights under the Fourteenth Amendment's due process clause, or, more specifically, her "substantive right to be free from infliction of unnecessary pain, right to physical safety, and right to bodily integrity." Dkt. No. 46-1 at 7-16; Dkt. No. 44 ¶¶ 13, 100-32. This claim surrounds alleged failures to act or omissions by Defendants Baker-Gamboa, Miller, and Zydonyk regarding the purported lack of proper reporting and investigation into A'Niyah's case before her death. Dkt. No. 44 ¶¶ 13, 100-32.

Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of

the Due Process Clause." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). This is because the Due Process Clause does not automatically confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. (citations omitted).

There are, however, certain exceptions to the general rule that the State does not have an affirmative duty to protect an individual from private harm, such as the state's duty to protect certain individuals placed in state custody. Id. at 198–99 (citing Estelle v. Gamble, 429 U.S. 97 (1976) (requiring that the State provide medical care to incarcerated individuals); Youngberg v. Romeo, 457 U.S. 307 (1982) (holding that the Due Process Clause requires the State to provide services that "ensure the reasonable safety" of involuntarily committed mental patients)). Under Eleventh Circuit jurisprudence, this "affirmative duty" exception also applies when the State undertakes a responsibility to care for "child[ren] involuntarily placed in a foster home." Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 797 (11th Cir. 1987). When extending this exception to the foster care space, the Eleventh Circuit reasoned that this is a "situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a [S]ection 1983 action for violation of [F]ourteenth [A]mendment rights." Id.

Mirroring the arguments raised in their previous motion to dismiss, dkt. no. 21, Defendants now contend that the State did not undertake an affirmative duty of care because A'Niyah was in her mother's custody, not state custody, dkt. no. 46-1 at 10. The Supreme Court addressed a similar issue in DeShaney, wherein the Court reasoned that the State did not have a constitutional duty to protect a child who was in the custody and control of his biological father, even where the State "may have been aware of the dangers" the child faced in this custody. 489 U.S. at 202. In a footnote, the Court drew a line between these non-custodial situations and distinct situations where "the State by the affirmative exercise of its power remove[s] [a child] from free society and place[s] [the child] in a foster home operated by its agents." Id. at 202 n.9 (citing Doe v. N.Y.C. Dep't of Soc. Servs., 649 F.2d 134, 141–42 (2d. Cir. 1981), after remand, 709 F.2d 782, cert. denied sub nom. Catholic Home Bureau v. Doe, 464 U.S. 864 (1983); Taylor, 818 F.2d at 794–797). The latter situation, according to DeShaney, might give rise to an affirmative duty to protect. Id.

Like the first amended complaint, the second amended complaint now before the Court does not plausibly allege that the State removed A'Niyah from the free world and placed her in foster

care operated by state agents.[4] See generally Dkt. No. 44. In fact, Plaintiff actually admits that A'Niyah was "left" in the legal custody of her mother at the mother's residence, and the factual allegations lend support to that conclusion by indicating that this was the same residence that Plaintiff visited after his phone call with Robinson and the same residence where A'Niyah was ultimately found unresponsive surrounded by poor living conditions. Id. ¶¶ 8, 31, 35–37, 71.

Despite Shelly Perry's custody of her daughter as noted in the second amended complaint, Plaintiff nonetheless concludes "DFCS had custody-level authority over A'Niyah"—a legal conclusion not entitled to an assumption of truth without a factual basis. Id. ¶ 117; Iqbal, 556 U.S. 678–79. The allegations added to the second amended complaint do indicate that, by virtue of DFCS, the state of Georgia exercised some degree of control over A'Niyah's living situation. See generally Dkt. No. 44; see also Powell v. Dep't of Hum. Res. of Ga., 918 F. Supp. 1575, 1578 (S.D. Ga. 1996) (explaining why a Georgia County DFCS branch operates as an "arm of the state"), aff'd sub nom. Powell v. Ga. Dep't of Hum. Res., 114 F.3d 1074 (11th Cir. 1997). More specifically, Plaintiff alleges that DFCS filed for a protective order for A'Niyah, which

[4] At oral argument, counsel for Plaintiff also conceded that A'Niyah was not in the *physical* custody of the State at the time of her death.

was granted by the juvenile court in October 2020, in response to the incident involving A'Niyah's broken leg. Dkt. No. 44 ¶ 71.

Through these juvenile court proceedings, A'Niyah was adjudicated "dependent pursuant to O.C.G.A §§ 15-11-202 and 15-11-212," but the court "left her in the legal custody of her mother" subject to a variety of mandatory conditions. Id. These included requirements that Shelly Perry follow all recommendations of the parental fitness assessment and complete a psychiatric evaluation and follow all recommendations. Id. Additionally, Shelly Perry was not to be unsupervised with the child, the child was to remain in the home of her current caregiver and all caregivers must be approved by DFCS. Id. Finally, the juvenile court indicated that DFCS was to make referrals for required services, imposed additional conditions regarding the providers of such services, and required that A'Niyah's parents comply with all reasonable requests and service providers, including attending all meetings. Id.

The Court holds that neither the limited DFCS oversight nor the juvenile court dependency adjudication described in the operative complaint support the legal conclusion that A'Niyah was in state custody. First, the dependency adjudication does not automatically mean A'Niyah was taken into DFCS custody. A "dependent child," in relevant part, is a child who "[h]as been abused or neglected and is in need of the protection of the court."

O.C.G.A. § 15-11-2(22)(A). While a "juvenile court may place a minor child in the protective custody of the Department," a child who is adjudicated dependent is not automatically placed in state custody by virtue of this dependency status. In Interest of H.B., 816 S.E.2d 313, 316 (Ga. Ct. App. 2018) (emphasis added) (citation omitted). Rather, under Georgia's Juvenile Code, dependency is one issue to be adjudicated according to its own set of governing factors, and custody is a separate issue to be adjudicated subject to a separate set of factors and its own "best interest of the child" standard. See Interest of Z.A., 897 S.E.2d 639, 643 (Ga. Ct. App. 2024) (listing one set of facts weighing on dependency and another set of facts impacting whether a particular custodial arrangement would be in the child's best interest). In other words, Georgia's legal landscape provides for situations where, as is the case here, a child is adjudicated dependent but is not placed in state custody because the facts of the case do not warrant removal from her parents' custody. Id.; see also In re S.C.S., 784 S.E.2d 83, 86 (Ga. Ct. App. 2016) (making custody change pending a separate hearing on dependency petition).

There is also a difference between state oversight and state custody. The conditions in the juvenile court's order primarily limit the actions of A'Niyah's mother, rather than amounting to state control over A'Niyah herself. See Dkt. No. 44 ¶ 71. And Georgia's Juvenile Code does not support Plaintiff's contention

that the state's providing some level of court-ordered protection based on dependency status is the same thing as the State forming a custodial relationship with that child—the two are, again, separate analyses. Interest of Z.A., 897 S.E.2d at 643; In re S.C.S., 784 S.E.2d at 86; Interest of R.E.M.B., 913 S.E.2d 425, 430 (Ga. Ct. App. 2025) (describing a case where child was adjudicated dependent in May 2022 but custodial parental rights were not terminated until February 2024, which occurred pursuant to a juvenile court order separate from the dependency decision). Therefore, A'Niyah was not in state custody based on the factual allegations in the second amended complaint. See generally Dkt. No. 44.

After accounting for this non-custodial relationship, though, it remains possible for a plaintiff to state a substantive due process claim against a state official if the official's act or omission is "arbitrary[ ] or conscience shocking, in a constitutional sense." White v. Lemacks, 183 F.3d 1253, 1257 (11th Cir. 1999) (citing Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992)); Dkt. No. 46-1 at 11; Dkt. No. 48 at 5–6. While there is no precise definition of what constitutes "arbitrary and conscience-shocking" conduct, the Eleventh Circuit has "cautioned that, in a non-custodial setting, a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to

someone in [A'Niyah's] position." Vaughn v. City of Athens, 176 F. App'x 974, 977 (11th Cir. 2006) (quoting Waddell v. Hendry Cnty. Sheriff's Off., 329 F.3d 1300, 1305 (11th Cir. 2003)). Courts are not to determine whether a defendant's conduct was egregious "in the glow of hindsight; decisions made by a government actor *must be egregious—that is, shock the conscience—at the time the government actor made the decision*." Id. (emphasis in original).

Conceptually, at the motion to dismiss stage, the factual allegations against Defendants Miller and Zydonyk are sufficient to account for conscience shocking behavior, but the allegations against Defendant Baker-Gamboa are not. First, as to Baker-Gamboa, Plaintiff alleges that (1) he alerted Baker-Gamboa of his concerns about A'Niyah's condition during the April 19, 2023 phone call; (2) despite having access to an in-house CPS investigator, Baker-Gamboa gave Plaintiff the number for the CPS hotline and said there was "nothing [DFCS] could do"; (3) Perry called the CPS hotline and no one answered his calls; and (4) Baker-Gamboa failed to report and process intake regarding the purported abuse of A'Niyah despite allegedly being required to do so under Georgia mandatory reporter laws and DFCS protocols and procedures. Dkt. No. 44 ¶¶ 23–34, 42–56, 64–67, 107–20.

Under the circumstances, the Court holds that these allegations against Baker-Gamboa fall short of "arbitrary[ ] or conscience shocking, in a constitutional sense." White, 183 F.3d

at 1257 (citing Collins, 503 U.S. at 128). Even turning to the minimum standard of liability, deliberate indifference, this requires that a Defendant be "subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff"—with the caveat, again, that even if a defendant actually knew of a substantial risk to a plaintiff's health or safety, liability will not be proper if defendant "responded reasonably to the risk." Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024).[5] The crux of Plaintiff's argument with respect to Baker-Gamboa is that she "was told of the abuse directly and chose to do nothing." Dkt. No. 54 at 7. This characterization, though, is not supported by the allegations in the operative complaint, as Baker-Gamboa did take *some action* to address Plaintiff's concerns on the phone, directing him to call CPS and providing contact information. Dkt. No. 44 ¶¶ 23–34, 42–56. Though Plaintiff called that phone number twice and did not receive an answer, Baker-Gamboa nonetheless provided guidance to Plaintiff as to the correct entity to address his concerns—rather than doing "nothing" at all to help. Id.

[5] Wade is an Eighth Amendment case, whereas Plaintiff pursues claims under the Fourteenth Amendment in this case. The Eleventh Circuit, however, maintains that "the standards under the Fourteenth Amendment are identical to those under the Eighth." Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007) (citing Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1115 (11th Cir. 2005)).

In this non-custodial scenario, these allegations are not sufficient to sustain a claim against Baker-Gamboa. This conclusion is so even if Baker-Gamboa's reporting and report intake procedure were not "textbook perfect." See Foy v. Holston, 94 F.3d 1528, 1537 (11th Cir. 1996) (concluding no clearly established constitutional right was violated by defendant even if the investigation and custody determination procedures were not "textbook perfect"). Accordingly, Counts I and II are **DISMISSED** as to Defendant Baker-Gamboa for failure to plausibly allege a Fourteenth Amendment violation.[6] That being so, because Count III (Plaintiff's request for attorneys' fees and costs styled as its own count) is a derivative claim, and there are no remaining substantive claims against Defendant Baker-Gamboa, Count III is **DISMISSED** as to Baker-Gamboa as well. See Williams v. Wal-Mart Stores E., LP, (Del.), 661 F. Supp. 3d 1264, 1272 (N.D. Ga. 2023).

On the other hand, the Court holds that Plaintiff has plausibly alleged a Fourteenth Amendment violation by Miller and Zydonyk—the two remaining Defendants. Specifically, in the amended complaint, Plaintiff alleges that "[d]espite their knowledge of

[6] As discussed at oral argument, the parties treat Plaintiff's wrongful death claim in Count I as "subsumed" within the substantive due process claim, meaning the two counts rise and fall together. Accordingly, both Counts I and II against Baker-Gamboa are due to be dismissed for failure to allege a Fourteenth Amendment violation. The Court also conducts the qualified immunity analysis, discussed infra, with respect to the two claims against Miller and Zydonyk as a singular analysis.

the GBI investigation, Defendants Miller and Zydonyk recommended to the juvenile court judge that the case involving Shelly Perry and A'Niyah Perry be closed. The operative complaint alleges that, as a result of their failure and *concealment*, the juvenile court judge dismissed the protective order and closed A'Niyah's dependency case." Dkt. No. 44 ¶ 127 (emphasis added). At the very least, the allegation of "concealment" could accommodate an affirmative choice by Miller and Zydonyk to intentionally withhold relevant information from the Court regarding A'Niyah's living situation, leading the Court to decline to remove A'Niyah from her mother's custody—where A'Niyah would ultimately die due to purported abuse and neglect. Id.

This allegation of concealment distinguishes the instant matter from DeShaney, wherein "the State may have been aware of the dangers that [the child] faced," but the State "played no part in their creation, nor did it do anything to render him more vulnerable to them." 489 U.S. at 201. Here, the State was not entirely uninvolved in creating the danger A'Niyah faced; rather, as noted by counsel for Plaintiff at oral argument, this is somewhat of a "hybrid" situation where Plaintiff alleges the juvenile court's decision to leave A'Niyah in a household where she was purportedly experiencing abuse and neglect was, in part, influenced by Miller and Zydonyk's alleged concealment of information. Dkt. No. 44 ¶ 127. Put differently, to the extent the

Eleventh Circuit takes issue with state action which puts a man in danger "as if it had thrown him into a snake pit," the present allegations support a conclusion that state employees had reason to believe that a minor child was in a "snake pit," had the opportunity to pull her out of that situation, and instead intentionally withheld information and left her there. Taylor, 818 F.2d at 797; Dkt. No. 44 ¶¶ 121–27. Perhaps discovery will shed more light on exactly how these events unfolded, but, for the purposes of the present motion to dismiss analysis, the Court holds that the factual allegations in the operative complaint, taken as true, make it plausible that a Fourteenth Amendment violation occurred due to Miller and Zydonyk's alleged concealment in a judicial proceeding.

**III. Qualified Immunity of Miller and Zydonyk**

As an alternative to their other arguments for dismissal, the remaining Defendants (Miller and Zydonyk) also argue that both Counts I and II should be dismissed on qualified immunity grounds.[7] Dkt. No. 46-1 at 16–17. Generally, qualified immunity "offers complete protection for government officials" who are, as here, sued in their individual capacities, if the official's conduct

[7] Defendant Baker-Gamboa also raises qualified immunity in the motion to dismiss. Dkt. No. 46-1 at 16–17. Because Baker-Gamboa has already been dismissed from this action, the Court declines to reach the issue of whether such immunity warrants dismissal of Plaintiff's claims as to Baker-Gamboa.

"does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1254 (11th Cir. 2010) (citations omitted). When a litigant asserts qualified immunity as a defense to liability, district courts must first discern whether "the defendant was engaged in a discretionary function." Miller v. Palm Beach Cnty. Sheriff's Off., 129 F.4th 1329, 1333 (11th Cir. 2025) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)).

If that is the case, the burden then "shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." Id. (quoting Harland, 370 F.3d at 1264). At that point, Plaintiff must satisfy a two-part inquiry, establishing that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Id. (quoting Harland, 370 F.3d at 1264). This two-step inquiry may be conducted in whatever order the district court deems most appropriate for the case. Id.

As a preliminary matter, the Court holds that Defendants Miller and Zydonyk acted within their discretionary authority when carrying out the actions challenged in the operative complaint.[8]

[8] While the Court notes that Counts I and II are against both Defendant Miller and Defendant Zydonyk, the Court nonetheless "must consider [qualified immunity] on a claim-by-claim and defendant-by-defendant basis." Miller, 129 F.4th at 1333 (citing

See generally Dkt. No. 44. On this point, courts look to whether there exist "objective circumstances which would compel the conclusion that [defendants'] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." Gibbons v. McBride, 124 F. Supp. 3d 1342, 1368–69 (S.D. Ga. 2015) (quoting Hutton v. Strickland, 919 F.2d 1531, 1537 (11th Cir. 1990)); see also Hatcher ex rel. Hatcher v. Fusco, 570 F. App'x 874, 877 n.3 (11th Cir. 2014) ("In the qualified immunity context, a government official acts within the scope of her discretionary authority when she pursues a job-related goal through means that are within her power to utilize." (citations omitted)). This inquiry centers on the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting Harland, 370 F.3d at

Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018)). In the second amended complaint, Plaintiff primarily refers to Defendants Miller and Zydonyk collectively, claiming that both Defendants carried out the same challenged actions. See, e.g., Dkt. No. 44 ¶¶ 85–86, 92–98, 103, 121–32. That being so, to the extent there exists any slight difference between Defendants Miller and Zydonyk in the allegations against them, the Court will note these differences and discern whether they impact the viability of the qualified immunity defense for that particular Defendant. See Harrell v. Batten, No. 5:24-CV-74, 2026 WL 458299, at *17 n.22 (S.D. Ga. Feb. 18, 2026).

1266).

Here, the allegations in the second amended complaint support a contention that Miller and Zydonyk acted within their discretionary authority—even if Plaintiff contends these Defendants *exercised* this discretion in an unconstitutional manner. Id. ¶¶ 24, 112-18; O'Rourke, 378 F.3d at 1205. Plaintiff clarifies that Miller was a DFCS case manager and Zydonyk a DFCS supervisor at the time of the complained-of events. Dkt. No. 44 ¶¶ 3-4. Through their authority as individuals tasked with investigating and managing various DFCS cases, Miller and Zydonyk made a recommendation to a juvenile court regarding how it should manage A'Niyah's case, even if Plaintiff now disputes the propriety of that recommendation. Id. ¶¶ 3-4, 87-98, 103, 121-32.

Because both Defendants were acting within their discretionary authority, the burden then shifts to Plaintiff to establish the violation of a constitutional right which was clearly established at the time of the alleged violation. Miller, 129 F.4th at 1333 (citing Harland, 370 F.3d at 1264). As the Court previously explained, supra, Plaintiff has plausibly alleged a violation of A'Niyah's substantive due process rights by Miller and Zydonyk. The remaining question, then, is whether this right was clearly established at the time of the alleged violation. Id.

Under Eleventh Circuit caselaw, a plaintiff may establish that a right was clearly established at the time of the alleged

violation in "any of three ways." Jarrard v. Sheriff of Polk Cnty., 115 F.4th 1306, 1323 (11th Cir. 2024), cert. denied sub nom. Moats v. Jarrard, 145 S. Ct. 2702 (2025). The plaintiff can (1) come forward with 'case law with indistinguishable facts clearly establishing the constitutional right,' (2) point to 'a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right,' or (3) show that officials engaged in 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" Id. at 1323–24 (citing Prosper v. Martin, 989 F.3d 1242, 1251 (11th Cir. 2021)).

Here, Plaintiff contends that the conduct described in the operative complaint "was so obviously wrong, in light of pre-existing law and mandatory, non-discretionary DFCS policies, that only a 'plainly incompetent official' would have done it." Dkt. No. 48 at 10 (citing Maddox v. Stephens, 727 F.3d 1109, 1121 (11th Cir. 2013)); see also Maddox, 727 F.3d at 1120 ("The doctrine [of qualified immunity] protects from suit 'all but the plainly incompetent or one who is knowingly violating the federal law[.]'"). In making this argument, Plaintiff points to the general proposition that "A'Niyah had the right to be free from unnecessary pain, right to physical safety, and right to her own bodily integrity under the Fourteenth Amendment of the United States Constitution." Dkt. No. 48 at 11 (citing Deshaney, 489 U.S. at

194; Taylor, 818 F.2d at 794-95; Powell, 114 F.3d at 1079). Of the three vehicles through which a party can meet the "clearly established law" prong of the qualified immunity analysis, this aligns with the second (a broad statement of principle) and third (conduct "so egregious" that a constitutional right was clearly violated) methods. Id.; Jarrard, 115 F.4th at 1323.

The Eleventh Circuit has specifically noted that, at least in the foster child context, a child has a "clearly established constitutional right to be free from unnecessary pain under the Fourteenth Amendment." Jorge T. ex rel. Carcano v. Fla. Dep't of Child. & Fams., 250 F. App'x 954, 956 (11th Cir. 2007) (citing Ray v. Foltz, 370 F.3d 1079, 1082 (11th Cir. 2004) ("It is clearly established in this circuit that foster children have a constitutional right to be free from unnecessary pain and a fundamental right to physical safety.")). Without opining on whether this general proposition should govern the novel aspects of this case (namely, that A'Niyah was not a foster child and remained in her mother's custody), the Court holds that the third method of demonstrating a right was clearly established applies here.

To this end, Plaintiff, again, alleges that Miller and Zydonyk concealed material information in a judicial proceeding tasked with making a custodial determination as to a minor child by declining to alert the tribunal of a pending GBI investigation

despite DFCS's alleged knowledge that such an investigation was occurring. Dkt. No. 44 ¶¶ 122-31. The Court holds that this allegation of concealment is sufficient to accommodate the intentional withholding of information. Id. These allegations of concealment are especially concerning in light of allegations that Defendants Miller and Zydonyk knew they were required under DFCS policies to conduct a joint investigation with law enforcement for all serious reports of abuse or neglect, including serious injury—the very type of investigation which Defendants are alleged to have concealed from the juvenile tribunal. Id. ¶¶ 122, 127. The Court holds that Plaintiff's allegations of this intentional, material omission accompanying Miller and Zydonyk's recommendation of case closure are sufficient to survive Defendants' motion to dismiss on qualified immunity grounds.

As such, while the Court does not find that qualified immunity applies to bar the claims against Miller and Zydonyk at this time, Defendants may re-raise qualified immunity at a later stage should facts develop indicating the actions taken by Miller and Zydonyk did not transpire as alleged. See Romano v. Citrus Health Network, Inc., No. 25-CV-24196, 2026 WL 1728894, at *12 (S.D. Fla. June 16, 2026) (denying motion to dismiss but noting that the question of qualified immunity could be re-raised at a later stage). At this procedural threshold, though, Defendants' motion to dismiss is **DENIED** as to Defendants Miller and Zydonyk.

**CONCLUSION**

At this time, Defendants' motion to dismiss the second amended complaint, dkt. no. 46, is **GRANTED in part** and **DENIED in part.** Specifically, the motion is **GRANTED** as to Defendant Baker-Gamboa, and all counts against Baker-Gamboa are **DISMISSED with prejudice.** The Clerk is **DIRECTED** to terminate Baker-Gamboa as a Defendant in this action. The motion to dismiss is **DENIED** as to Defendants Miller and Zydonyk.

**SO ORDERED** this 28th day of September, 2026.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA